COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| J.D.S., | § | No. 08-14-00191-CV |
| Appellant, | § | Appeal from |
| v. | § | 109th District Court |
| TEXAS DEPARTMENT OF FAMILY PROTECTIVE SERVICES, | § | of Andrews County, Texas |
| Appellee. | § | (TC # 19,198) |

## **O P I N I O N**

This is an appeal from an order terminating the parent child relationship between JDS and LS predicated upon Texas Family Code subsections 161.001(1)(D), (E), (O), and a finding that termination is in the best interest of the child. The final order appoints the Department as the child's sole managing conservator. In eight issues[1], JDS challenges the legal and factual sufficiency of the evidence to support termination. For the reasons that follow, we affirm.

### FACTUAL SUMMARY

LS was five years old at the time of trial. JDS was incarcerated throughout the pendency of the case and at the time of trial, with a scheduled release date of March 25, 2015. She has a

---

[1] In Issues One and Two, JDS challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of LS. Issues 3 and 4 complain that the evidence is legally and factually insufficient to support the trial court's finding that termination is proper under TEX.FAM.CODE ANN. § 161.001(1)(D), while Issues Five and Six raise the same complaints with regard to the findings under subsection (1)(E). The final two issues address the sufficiency of the evidence to support termination based on subsection (1)(O). All references herein relate to TEX.FAM.CODE ANN. §§ 161.001(1)(D), (E), (O) and 161.001(2).

criminal history which is of significance here. In August 2013, she pled guilty to endangering a child, retaliation against a police officer, and theft. The endangerment charge arose from an incident in December 2012 when she ran away from police with LS in her arms. She explained that the police were at her home because she crashed her car into a washer, dryer, and trailer that rolled into the street and blocked traffic. She admitted she was intoxicated at the time. She heard the police arrive and grabbed her daughter, who was not wearing a coat, and ran to the alley. The retaliation charge followed because she threatened the police officer. The theft conviction involved a PlayStation that she stole from someone who was living in her home. JDS also admitted to using synthetic marijuana and a drug test conducted before her arrest was positive for marijuana. The record also reveals she was convicted in 2006 of assault causing bodily injury to a family member and abandonment or endangering her child. This child was removed by the Department and eventually adopted by non-relatives. While JDS was initially placed on deferred probation, it was revoked when she was convicted of the later offenses.

The Department became involved after receiving reports of neglect. An investigation launched in March 2013 revealed that Mother and child were living in a home with broken windows, no electricity, no hot water, mice, roach infestation, and moldy food. There were also questions about whether LS was receiving proper dental care. JDS testified that she and LS were living with JDS's boyfriend and his father. She knew the home was unfit. She offered various explanations, such as the father had a habit of putting dirty dishes in drawers which attracted roaches. The home had mice and she laid out poison which resulted in mice "basically just dying everywhere." The refrigerator was broken. She believed LS was confused about the electricity, claiming a bulb had merely burned out. The hot water heater had been non-functioning for just a few days.

By the time the investigation was completed, JDS was incarcerated. LS was placed with her maternal grandmother. According to the Department investigator, a safety plan was prepared that placed LS with her grandmother until her mother was released from jail. At that point, the Department planned to provide JDS with services and supervised visitation. The child was removed from the grandmother when she tested positive for marijuana. The Department filed a removal petition and LS was placed in foster care. The foster mother, referred to by the fictitious name of "Cindy Furman," testified that the child had been with her for a year by the time of trial. The little girl was doing "phenomenally well" in school and was "flourishing."

> She has actually excelled than most of the other kids in her class in her Head Start program. She continues to read at home. We go to the library every three weeks and pick up some books, and she will read, every night, five pages. And we will read to her so that she will continue to have that knowledge when she goes to kindergarten next year, which she is already registered. I've already registered her for kindergarten. She wrote this story about us.

> She has improved since she first started. And she knows her numbers, and she has actually learned math. So she has actually excelled more than expected. And she excelled the most in her class, but that's because we encourage her at home. We have flashcards for her. We read to her. We do math with her. She goes to gymnastics.

The CASA[2] supervisor testified that LS is bonded to the Furmans and attached to both of them, refusing to call them anything other than her "mom and dad." They in turn were very loving toward the child. The CASA report contained in the clerk's record indicates that JDS was believed to use methamphetamines and heroin but claimed she only smoked synthetic marijuana. There was a history of domestic violence between JDS and her boyfriend. The report recites JDS admitted that when she was seventeen, she had a child removed by CPS.

With regard to dental care, Cindy explained that the child needed immediate attention related to decay and cavities that caused an infection. One tooth was pulled because it could not

---

[2] CASA refers to a court appointed special advocate who serves as the child's guardian ad litem.

3

be saved. LS now has four caps on her teeth. JDS admitted to giving the child chocolate milk and fruit juices despite having been told to limit her sugar intake because of the dental issues.

LS told her caseworker, Zaneta Castro, that she was afraid of the "Chucky doll." LS described vivid nightmares about the doll standing next to her bed with a knife. This caused an incidence of bedwetting. Another instance of bedwetting occurred when LS received a card from her mother. Castro did not anticipate a problem because the card only said "I love you," but the child experienced nightmares and bedwetting. LS was receiving therapy, and the caseworker explained that bedwetting is a symptom of psychological issues. The bedwetting and nightmares continued to be addressed and her therapist recommended that the child have no contact with her mother. All letters and photographs thereafter were given to the therapist, who made the ultimate decision as to whether they were appropriate for the child to see. LS did not want to sleep by herself and needed five night lights. JDS testified that LS did not have nightmares and rarely wet the bed. She also admitted the little girl slept between JDS and her boyfriend.

With regard to completion of the safety plan requirements, Castro testified that JDS failed to complete the individual counseling that was recommended by her drug and alcohol assessment and psychological evaluation. She also related that JDS failed to visit with the child the requested minimum of two hours due to her incarceration. In response, JDS testified that she participated in a number of classes while incarcerated and that she would have participated in all the services the Department was offering had she not been incarcerated. She completed anger management and learned about establishing relationships with others. She also learned "consumer smarts, money management, setting goals, parenting skills, the different food groups, healthy choices, and bad choices."

4

Castro testified that she was concerned for the child's safety, emotional and psychological well-being, and development if the parental rights were not terminated. The caseworker recounted that LS "fears going back" and has "experienced a traumatic amount of insight that a five-year-old should typically not know."

> Well, the concerns I have regarding LS is that for being her age, at the age of five, she is very knowledgeable of very negative things that have happened in her past, whether she can tell you about, you know, guns, and, you know, bad drugs, or she can tell you about the Chucky doll, a knife. I mean, very vivid things that she talks about. She is very vivid when she does talk to you about things. It is very concerning that -- she has a fear of any of these things going back, from receiving a simple card to having nightmares and talking about how she doesn't want to go back to being in that situation. And she will mention, you know, past paramours of mom and -- and that's the reason why she brings up the Chucky doll. So she is very scared about certain things that occur, but she does mention, you know, that -- she does care, but then she will turn back around and she will just say how she is scared about the Chucky doll. And that's the main thing she does bring up, which causes the bedwetting.

The Department sought termination so that LS would be eligible for adoption by the Furmans, who are interested in doing so because she is "a part of our family."

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN**.** § 161.001 (West 2014). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v.*

5

*Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003)(noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)(in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex. 2002)("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### *Burden of Proof*

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20–21; s*ee In re M.S.,* 115 S.W.3d at 547 and *In the Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.) (cases recognizing that involuntary termination of parental rights is a drastic remedy which

6

divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex. 2003)(noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2014); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007)(contrasting the standards applied in termination proceedings and the standards applied in modification proceedings). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied)(op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

### Standards of Review

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180

7

S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

### *Statutory Predicates*

The termination order here was based on TEX.FAM.CODE ANN. § 161.001(D)(E) and (O), with the court finding that JDS had:

• Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child [subsection (D)];

• Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child [subsection (E)]; and

• Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child [subsection (O)].

Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Doyle v. Texas Department of*

8

*Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied). While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Doyle,* 16 S.W.3d at 394. Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. *See In Interest of B.S.T.,* 977 S.W.2d 481, 484 (Tex.App.--Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.,* 728 S.W.2d 73, 83-84 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle,* 16 S.W.3d at 394. Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection (D). *Id.; see In the Interest of W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ)("environment" refers to the acceptability of living conditions). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.). The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle,* 16 S.W.3d at 394; *In re B.S.T.,* 977 S.W.2d at 484; *In re S.H.A.,* 728 S.W.2d at 84.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle*, 16 S.W.3d at 395; *In re B.S.T.*, 977 S.W.2d at 484; *In re S.H.A.*, 728 S.W.2d at 83-

84. The conduct to be examined includes what the parents did both before and after the child was born. *In Interest of D.M.,* 58 S.W.3d 801, 812 (Tex.App.--Fort Worth 2001, no pet.); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 84 (Tex.App.--Dallas 1995, no writ). To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Id.*; *In the Interest of C.D.,* 664 S.W.2d 851, 853 (Tex.App.--Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In the Interest of K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In Interest of N.K.,* 99 S.W.3d 295, 300 (Tex.App.--Texarkana 2003, no pet.). Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In the Interest of J.T.G.,* 121 S.W.3d 117, 133 (Tex.App..--Fort Worth 2003, no pet.). Imprisonment alone does not constitute an endangering course of conduct but it is a fact properly considered on the endangerment issue. *Boyd,* 727 S.W.2d at 533-34; *In the Interest of R.W.,* 129 S.W.3d 732, 743-44 (Tex.App.--Fort Worth 2004, pet. denied). Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being. *See In the Interest of S.D.,* 980 S.W.2d 758, 763 (Tex.App.--San Antonio 1998, pet. denied). However, "the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' of the child under section 161.001(1)(E), even where the parent is incarcerated." *In the Interest of D.T.,* 34 S.W.3d 625, 640 (Tex.App.--Fort Worth 2000, pet. denied).

10

Finally, under subsection O, the Department has the burden to establish that (1) the parent was ordered to comply with a family service plan as a result of the child's removal for abuse or neglect, and (2) she failed to comply with the requirements of the family service plan.

### *Best Interest of the Child*

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree,* 907 S.W.2d at 87.

### *Sufficiency of the Evidence to Support Statutory Predicate*

#### HOME ENVIRONMENT

We find the evidence to be both legally and factually sufficient to support termination under subsections (D) and (E) for the following reasons. The home in which the child lived for two years prior to removal can only be described as deplorable. Remarkably, JDS testified that

11

the home was "100 times better" at the time of the Department investigation than when she and LS first moved in two years prior. JDS insisted that others who had lived in the house destroyed it, and that may well be true. That is not the issue. The issue is that she allowed her daughter to live in a home infested with roaches and mice. Moreover, JDS discussed how she spread poison throughout the home and that mice were dying everywhere. Both the mice and the poison endangered this little girl. The refrigerator was broken, again by others, which explained the moldy food, but JDS never explained why there wasn't any other food in the house for her daughter to eat. LS told her case worker that the home had no electricity and it was cold. JDS explained that the house was big and old and cold, but that she had space heaters. According to her, the family mostly lived in the bedroom area. She also claimed that LS must have thought there was no electricity because she had seen a light bulb blow out. While there was running water, there was no hot water. JDS explained it this way:

Q: You said you were having some problems with the water heater went out, and -

**A.** Well, I -- when they came to my house, I told them that I would shut the water -- the electricity to the water well off because there was a leak in the pump, and it would leak out into the alley. And the City was going to fine me for it. They kept putting notes on my door saying, you know, if you don't get this fixed, we are going to fine you. Well, it was a really expensive part, and my electricity bill was running like $900 a month. Because the pump would click on and off, on and off, because it was leaking in the alley. So what I would do was just shut the electricity off to the water well, and I would only turn it on when we were going to take a bath or wash the dishes. But we were in the process of having that fixed.

The trier of fact was the judge of witness credibility and we will not encroach on that territory.

### MEDICAL CARE

The child's teeth presented a serious health issue. LS complained that they hurt every day and that she wanted to see the doctor so she could eat again. JDS testified that she knew of the problem, but she had transportation issues because "the back window of her car had been

12

busted out." She said she took the child to the emergency room and LS received antibiotics. She had spoken with a dental office but they would not see the child until she completed her course of antibiotics. JDS offered that she then would have taken the child to a dental appointment had she not been arrested. Again, that may well be true, but the extent of the dental damage was long in the making. The tooth decay and cavities caused LS to develop a serious infection. One tooth was pulled because it could not be saved. Four other teeth were capped.

## CRIMINAL HISTORY

JDS is incarcerated with a scheduled release date of March 25, 2015. She pled guilty to endangering a child, retaliation, and theft in 2013. This was not her first charge relating to endangerment of a child. She was convicted in 2006 of assault causing bodily injury to a family member and abandonment or endangering her child. The 2012 charges arose from her conduct when she was admittedly intoxicated. She has also admitted to using synthetic marijuana and a drug test conducted before her arrest was positive for marijuana. While JDS was initially placed on deferred probation, it was revoked when she was convicted of the later offenses. Her repeated criminal conduct threatens the child's sense of stability and security.

## PARENTAL JUDGMENT

Castro testified that LS spoke of "not wanting to go back" and the memories she had of her mother's prior relationships. The child talked of family violence. While JDS did not show LS the scary movie the child equated with the Chucky doll, she allowed LS to live in that environment. When LS developed nightmares and did not want to sleep alone, JDS allowed her to sleep between the mother and the mother's boyfriend. She saw nothing wrong with this arrangement. Additionally, JDS allowed other people to live in the home, the very people she claimed trashed the house, broke the windows and knocked holes in the walls.

13

Based on the undisputed evidence, the trial court could have reasonably formed a firm belief or conviction that JDS violated subsections 161.001(1)(D) and (E). The evidence is thus legally and factually sufficient to support the statutory predicate. And because the evidence establishes that the trial court did not err in this regard, a review of the evidence to support the finding under subsection 161.001(1)(O) is unnecessary. *See In the Interest of A.V. and J.V.*, 113 S.W.3d 355, 361 (Tex. 2003)(only one statutory predicate ground is necessary to support termination of parental rights when there is also a finding of best interest). We overrule Issues Three, Four, Five, and Six. We do not address Issues Seven and Eight.

### *Sufficiency of the Evidence to Support Best Interest*

We are left with Issues One and Two. We have previously outlined the *Holley* factors which are to be considered in determining the best interest of the child. With regard to this little girl's desires, she told Castro that she does not want to return to her prior situation. She has bonded well with her foster family and insists, to the point of correcting others, that the Furmans are her "mom and dad." In contrast, she refers to her mother as "JDS," with whom she had not had contact for some fourteen months. A simple birthday card created such a reaction that the child's therapist recommended no contact and thereafter routinely screened all communications from JDS.

Secondly, we consider the emotional and physical needs of the child, now and in the future, in conjunction with any corresponding emotional or physical danger. Future conduct may indeed be predicted by past conduct. LS needs stability, security and continuity. JDS has provided her with deplorable living conditions, exposed her to vermin and poison, jeopardized her well-being by alcohol and marijuana, and terrified her by an inappropriate movie whose impact was exaggerated by the presence of a life-like doll. LS did not want to sleep alone and

14

needed numerous night lights. Her mother's response was to allow the child to sleep between the adults in the house, a fact which she now understands was inappropriate. JDS long delayed in seeking dental treatment for the child, at great cost to the child's health, and admittedly rejected directions that she not add chocolate to milk, or permit her to drink sugary juices which would further her dental issues.

Third, we must analyze the parenting ability of JDS and the programs available to her when she is released from prison. The facts we have highlighted cast shadows over her judgment. We do recognize that she has completed a variety of courses while incarcerated to improve her skills and she is to be commended for doing so. Nevertheless, the fact finder could well have disbelieved that she would seek out additional services upon her release. She has a pattern of repeating her prior mistakes. While she has pled guilty -- twice -- to endangerment of a child, she continues to offer excuses and blame others.

Fourth, we look to the competing plans for the child and the stability of placement. The Department sought permanent sole managing conservatorship, continued placement with the Furmans, and anticipated adoption. Without question, LS is thriving in their home. She loves them, considers them to be her "mom and dad," and her psychological issues have been steadily improving thanks to therapy and their continual parental support. She is reading, writing stories, and doing math. JDS herself recognized the bond:

> I don't want my daughter to just be yanked out of the foster parents' home either, because I love her and I want to protect her heart, too, you know. I do want to remain as her mother and I am going to continue fighting them and continue doing everything I can to be a better mother, but I don't -- I want them to have a relationship with her, too.
>
> **Q:** Okay. And would you be willing to take classes once you got out of prison that the CPS offered, if that was --
>
> **A:** Yes, ma'am.

**Q:** -- if that was allowed?

**A:** Yes, ma'am.

**Q:** Okay. And you realize you can't have [LS] right now?

**A:** Yes, ma'am, I understand. And I -- and I know it's for the best for her. I am just -- I am just asking for a chance to get out and prove myself, because, you know, I can -- I can show you all the certificates and say, you know, all I want to say, but the real test is when I am released, you know. And I am just asking for a chance to prove to everybody that I love my daughter with all my heart.

Her plan was to find a home, a job and a car within ninety days of her release. She offered no specifics. While LS had initially been placed with her maternal grandmother, she was removed when the grandmother tested positive for marijuana. JDS testified that she had cut all ties with everyone except her brother, but she said nothing else about him and he did not testify. LS spoke vividly to Castro about her mother's prior relationships and those memories prompted her to repeatedly state that she did not want to go back. The therapist believed that the child should not be returned to her mother and should stay in placement with her foster family. JDS sought reunification with her daughter for the simple reason, as she phrased it, "I am her biological mother. A child should be with their parents."

Our extensive factual summary well outlines the acts or omissions which indicate that the parent-child relationship between JDS and LS is not a proper one. Having done so, we review her excuses. The house where she lived was "a 100 times better" than when they had moved in. Other people living there had "trashed" it, tipped over and broken the refrigerator, splashed paint, broken windows, and knocked holes in the walls. At one point, JDS explained she had called the exterminators and that mice and roaches were common for an older home. She then explained that she laid out rat poison so as to explain the carcasses and blamed her boyfriend's father for putting dirty dishes in the drawers. The electricity was not "off" as LS described and

16

the child simply misunderstood a blown light bulb. Hot water was available for baths and dishwashing but not otherwise due to a broken or leaking pump. She downplayed the theft charge because the PlayStation she stole was in her own home, although it belonged to someone else. She believed the 2013 endangerment charges stemmed solely from carrying LS outside without a coat in the winter, not from driving with the child while intoxicated. Indeed, she claimed the child was not even in the car. JDS was arrested for retaliation because she threatened the officer while she was drunk, and she received a two year sentence for that conviction, to which, we repeat, she pled guilty. JDS claims she has spent time writing to her daughter, but according to the caseworker, these notes contained promises. Given the child's reaction to a birthday card that led her to remember past experiences and caused an increase in the recurrence of nightmares and bedwetting, the therapist would not give the messages to her. So convinced was he, that he did not recommend that LS be returned to her mother, opting instead to recommend continued placement with the Furmans. Lastly, although LS had been progressing with her therapy and the number of sessions had been reduced, she began to regress shortly before the case went to trial. From this, a fact finder could conclude that the child was afraid of returning to her mother.

We have no doubt JDS loves her child. Sometimes, love is not enough. It is not a question of a modest home versus a luxury lifestyle. It is a question of hygiene and health. It is a question of nutrition and nurturing. It is a question of parenting rather than promising. It is a question of presence in her life. JDS has pled guilty to child endangerment twice. Both children were removed. One has already been adopted. The future of LS hangs in the balance. Applying the requisite standards of review, and giving due regard to the elevated burden of proof, we conclude that a reasonable fact finder could have reasonably formed a firm belief or conviction

17

that termination was in the best interest of the child.  We overrule Issues One and Two and affirm the judgment of the trial court.


September 24, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, J., and Barajas, C.J., (Senior Judge)
(Barajas, C.J., Senior Judge, sitting by assignment, not participating)

18