

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00396-CV

**IN THE INTEREST OF H.A.G.**, a Child

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2012-PA-02990
Honorable Olin B. Strauss,[1] Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Karen Angelini, Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  November 21, 2014

AFFIRMED

Xiomara M. appeals the trial court's order terminating her parental rights to her son H.A.G.[2] She contends that the evidence was legally and factually insufficient to find both that she endangered H.A.G.'s well-being and that termination was in H.A.G.'s best interest. In a separate issue, she argues that the trial court failed to apply the appropriate "clear and convincing evidence" standard. We affirm.

### PROCEDURAL HISTORY

In December 2012, the Department of Family and Protective Services (DFPS) filed a suit affecting the parent-child relationship, seeking temporary managing conservatorship of H.A.G.

---

[1] Senior Judge, sitting by appointment.
[2] We use aliases in this opinion to protect the child's identity. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

and termination of Xiomara's parental rights. The trial court granted DFPS's request for temporary managing conservatorship of H.A.G., who was only seven months old. Following a bench trial in May 2014, the trial court rendered judgment terminating Xiomara's parental rights. In its Order of Termination, the trial court made the following findings:

> 6.1. The Court finds by clear and convincing evidence that termination of the parent-child relationship between **XIOMARA** . . . and [H.A.G] is in the child's best interest.
>
> 6.2. Further, the Court finds by clear and convincing evidence that **XIOMARA** . . . has:
>
> > 6.2.1. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(1)(D), Texas Family Code;
> >
> > 6.2.2. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(1)(E), Texas Family Code; . . . .

Xiomara filed this appeal.

## STANDARDS OF REVIEW

A judgment terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West 2014). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to determine whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). We do not reweigh issues of witness credibility but defer to the factfinder's reasonable determinations of credibility. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

A legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the heightened burden of proof by clear and convincing evidence. *Id.*

When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* The evidence is factually insufficient "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*

### APPLICATION OF THE CLEAR AND CONVINCING EVIDENCE STANDARD

In one issue, Xiomara contends the trial court failed to apply the "clear and convincing evidence" standard to support its findings. Because she acknowledges the trial court's express application of this standard in the findings quoted above, we construe the issue as asserting that the trial court's findings were not supported by clear and convincing evidence. The legal and factual sufficiency standards of review in parental termination cases incorporate this heightened evidentiary standard. *See In re C.H.*, 89 S.W.3d at 25. Thus, we consider this issue along with the legal and factual sufficiency challenges. *See id.*

### SUFFICIENCY OF EVIDENCE SUPPORTING THE TRIAL COURT'S FINDINGS

"To terminate parental rights, the fact-finder must find by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code

and that termination is in the best interest of the child." *In re J.P.B.*, 180 S.W.3d at 572. Xiomara challenges the legal and factual sufficiency of the trial court's endangerment findings under subsections 161.001(1)(D) and (E), as well as its best-interest finding.

*Endangerment Findings*

A parent commits an act prohibited by section 161.001(1) by "knowingly plac[ing] or knowingly allow[ing] the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or] . . . engag[ing] in conduct or knowingly plac[ing] the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (West 2014). Our inquiry under subsection 161.001(1)(D) "is related to whether the environment of the children is the source of endangerment to the children's physical or emotional well-being." *In re T.N.S.*, 230 S.W.3d 434, 438 (Tex. App.—San Antonio 2007, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under subsection (D)." *J.D.S. v. Texas Dep't of Family Protective Servs.*, — S.W.3d —, No. 08-14-00191-CV, 2014 WL 4745794, at *5 (Tex. App.—El Paso Sept. 24, 2014, no. pet. h.). Under subsection 161.001(1)(E), our inquiry "relates to whether the endangerment of the child is the direct result of the parent's conduct." *In re T.N.S.*, 230 S.W.3d at 438. "[T]ermination under subsection (E) must be based on, not just a single act or omission, but a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* at 439.

Xiomara testified that as of early 2012, she resided in San Antonio with Rosa and Jesse G.,[3] her employers and friends of her family. She testified that on October 24, 2012, she had left H.A.G. unattended and unsecured on a sofa while she was cleaning in another room. She later found him face down on the ceramic tile floor and took him to the hospital after his right arm started to swell.

At the hospital, x-rays were taken of H.A.G.'s right arm and his arm was placed in a splint. DFPS investigator Jose Morales, who was contacted by hospital staff, met Xiomara at the hospital. He testified that he discussed H.A.G.'s injuries with a doctor and then separately with Xiomara. Morales testified that Xiomara exhibited no significant emotional response. She denied that anyone had intentionally harmed H.A.G. and insisted that H.A.G. must have rolled off of the sofa. He testified that he expressed concern about her leaving her infant unattended anywhere, and she indicated that she understood and would not do it again.

After H.A.G.'s hospital visit, H.A.G. rolled off a bed on two more occasions. Xiomara testified that two weeks after H.A.G.'s hospital visit, she once again left H.A.G. unattended and unsecured, and H.A.G. rolled off a bed onto a thinly carpeted floor. Xiomara testified that she stopped working for Rosa and Jesse G. and moved to New Braunfels to live with Genardo Castillo (her father's friend) and Castillo's girlfriend, Isabel Soto. Xiomara and Soto each testified that H.A.G. was again left unattended and unsecured on a bed, and H.A.G. rolled off of the bed onto a wooden floor. No medical treatment was sought on either occasion.

Dr. James Lukefahr, a child abuse pediatrician, testified that a review of H.A.G.'s hospital x-rays revealed other fractures in his right arm. Dr. Lukefahr testified that the fractures were in

---

[3] Xiomara named Jesse G. as the father on H.A.G.'s birth certificate at Jesse's suggestion. However, evidence showed that another man was H.A.G.'s actual father. The actual father was served by publication but did not appear at any time during the proceeding.

various stages of healing. He opined that the nature of the fractures showed that they were likely not caused by H.A.G. falling off of a sofa or bed; they were more likely intentionally inflicted by someone with the strength of an adult. He explained that two of the arm fractures were "bending" fractures located in the middle of the forearm, and that bending fractures result from holding one end of a child's arm and applying pressure to the other end. Dr. Lukefahr also testified that a third arm fracture was a "bucket handle" fracture, which is highly associated with abusive injury as it is caused by a forceful twisting or jerking of the arm. Although he admitted that the fracture could be caused by a fall from a sofa or bed, he testified that chances were 95% that the fractures were inflicted rather than accidental.

Dr. Lukefahr further testified that after the other arm fractures were discovered, a full-body x-ray of H.A.G. was taken. He explained that the x-ray revealed a fracture along the entire left side of H.A.G.'s skull. Dr. Lukefahr testified that H.A.G.'s skull fracture occurred within the prior two-and-a-half months, but it was likely not sustained when H.A.G. purportedly fell off of the sofa in October 2012. His explanation was that H.A.G.'s hospital records showed he had a bruise on his forehead from the October incident, and therefore it was unlikely he would have sustained a left-side skull fracture had H.A.G. only fallen off of a sofa.

Xiomara testified that only she and Rosa G. would watch H.A.G. and that she never placed H.A.G. in anyone else's care until after moving to Castillo and Soto's residence. Specifically, she explained that she would take H.A.G. to work at Rosa and Jesse G.'s restaurant every day. Xiomara and Rosa G. ran the restaurant and, as Xiomara testified, they would frequently leave H.A.G. unattended and unsupervised in the restaurant office. Xiomara testified that she thought Rosa G. might have harmed H.A.G. because she would hear him cry when Rosa G. was alone with him in the office. However, Xiomara admitted that the reason she left Rosa and Jesse G.'s residence was not because of danger to H.A.G., but because Rosa and Jesse G. decreased her weekly pay.

After reviewing the record as a whole, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Xiomara knowingly endangered H.A.G.'s well-being. *Cf. In re J.P.B.*, 180 S.W.3d at 574 (affirming termination on ground of endangerment under similar facts); *In re J.D.B.*, 435 S.W.3d 452, 466 (Tex. App.—Dallas 2014, no pet.) (same); *C.H. v. Tex. Dep't of Family & Protective Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.) (same). Thus, we overrule Xiomara's legal and factual sufficiency challenges to the trial court's endangerment findings.

### *Best-Interest Finding*

The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* "Evidence that the parent has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past

does not *ipso facto* prove that termination is currently in the child's best interest." *In re O.N.H.*, 401 S.W.3d at 684 (internal citation omitted). However, a factfinder may measure a parent's future conduct by his or her past conduct in making the best-interest determination. *Id.*

H.A.G. was only two years old at the time of trial and was therefore too young to express his desires. However, the evidence showed that Xiomara's acts or omissions caused H.A.G. to fracture his arm more than once and his skull at least once. While this evidence might be sufficient for the trial court to have formed a reasonable belief or conviction that termination was in H.A.G.'s best interest, *see In re C.H.*, 89 S.W.3d at 27, there was evidence of other *Holley* factors. Luisa Pulido, a court-appointed special advocate, testified that H.A.G. had bonded with his foster family. She recommended H.A.G.'s placement with them rather than Xiomara. Xiomara admitted that H.A.G. would not be endangered by the foster parents and that he would have a good life with them.

Xiomara suggested that she and H.A.G. could continue to reside with Soto and Castillo. The evidence revealed that Soto initially refused to allow DFPS to conduct a home study and that her children opposed keeping H.A.G. in the home. Soto testified that she, her daughter, Castillo, and Xiomara would have to work together to care for H.A.G., but admitted that her daughter was likely about to move away to college and her husband's work schedule was not always consistent. Moreover, Castillo did not testify at trial as to his willingness to help care for H.A.G., and Soto's description of her family's work schedules left several hours in the afternoon during which no one would be home to take care of H.A.G. Furthermore, Soto testified she knew Xiomara for two years but they did not spend much time together. Soto's testimony showed that she was not informed by Xiomara of the extent of H.A.G.'s injuries, and that H.A.G. had spent only one month in her home. There was also evidence of growing tensions between Xiomara and Soto, and that Xiomara had threatened to sue Soto.

Mary Ponce, a psychologist who evaluated Xiomara, recommended termination. Ponce testified that she psychologically evaluated Xiomara and found that she had a non-specified personality disorder exhibiting paranoid and narcissistic traits that could limit Xiomara's parental abilities. *See In re S.A.P.*, 169 S.W.3d 685, 707-08 (Tex. App.—Waco 2005, no pet.) (considering the parent's uncorrected narcissistic and paranoid personality traits relevant to the best-interest analysis), *abrogated on other grounds by In re E.C.R.*, 402 S.W.3d 239 (Tex. 2013). Ponce testified that people with such disorders tend to have limited empathy, a lowered ability to accept responsibility for their actions, and exercise poor decision-making regarding the needs of others. As a result, Ponce explained, these traits could cause a dangerous situation for a young child and are linked to incidents of child abuse. Ponce also testified that her recommendations for Xiomara to address these issues were not followed or completed.

Xiomara testified that she had another son who she had left in Honduras to come to the United States; her other son was seven years old and left in the care of Xiomara's mother. Although Xiomara stated that she sent money to her child in Honduras, she admitted that while H.A.G. was in the care of foster parents, she never sent any money, clothes, books, or gifts to H.A.G., not even for his birthday.

In her challenge to the sufficiency of the trial court's best-interest finding, Xiomara argues that the trial court ignored evidence that she had completed the therapy recommended under the Family Service Plan. However, Xiomara testified inconsistently about whether she had benefited from therapy. Ponce testified that Xiomara's personality disorder was likely the cause of her evasiveness regarding how H.A.G. was injured. Ponce explained that although Xiomara attended ten therapy sessions with Elsa Castleberry (a licensed professional counselor), the sessions likely would not have helped Xiomara's personality disorder if she would not acknowledge what happened to H.A.G.

Castleberry's testimony confirmed that Xiomara did not offer much information during the ten therapy sessions. Castleberry explained that Xiomara maintained that she was not sure how H.A.G. sustained his injuries other than falling once from a sofa. Xiomara did not inform Castleberry about any other incidents of H.A.G. falling off of the bed. Castleberry testified that on a scale of one to ten, she would give Xiomara's level of participation a four. She also testified that simply because Xiomara had completed ten sessions did not mean that she made any progress. Clinton Price, a psychiatrist who evaluated Xiomara, also testified that she was not truthful with him during therapy sessions. At trial, neither Price nor Castleberry recommended that Xiomara retain her parental rights.

Although Xiomara summarily stated that she had stable employment, the more specific evidence regarding her employment showed otherwise. Specifically, she testified that she left the employment of Jesse and Rosa G. and did not have a job when she moved in with Soto and Castillo. Xiomara found a job working for the Quality Inn, but then left after DFPS petitioned for termination of her parental rights. Although Soto and Xiomara testified that Xiomara had another job, they gave very few details about her work. Furthermore, the trial court had additional reason to disbelieve Xiomara's testimony about the stability of her employment because she admitted during trial to having previously lied under oath about her employment at the temporary orders hearing.

Xiomara's other testimony that she complied with service programs, attended parenting classes, had a stable home, and would do anything to have H.A.G. returned to her was undetailed and inconsistent with other witnesses' testimony and even her own. We cannot say that her testimony sufficiently discredited the State's evidence to preclude the trial court from forming a firm belief or conviction that termination was in H.A.G.'s best interest. Because the trial court resolved issues of Xiomara's credibility in the State's favor, and because those determinations

were reasonable, we must defer to those determinations. Viewing the record as a whole, we hold that the evidence permitted the trial court to form a firm belief or conviction that termination of Xiomara's parental rights was in H.A.G.'s best interest. We therefore overrule Xiomara's legal and factual sufficiency challenges to the trial court's best-interest finding.

## CONCLUSION

Because we overrule Xiomara's legal and factual sufficiency challenges to the trial court's endangerment and best-interest findings, and along with them, the issue that the trial court failed to apply the "clear and convincing evidence" standard, we affirm the trial court's judgment.

Luz Elena D. Chapa, Justice