

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-15-00137-CV

IN THE INTEREST OF R.S. AND
A.S., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-99677J-14

----------

## MEMORANDUM OPINION[1]

----------

Appellant T.B. (Mother) appeals from the trial court's order terminating her parental rights to her daughters A.S. (Anna) and R.S. (Regina).[2] In two issues, Mother argues that the evidence is legally and factually insufficient to find grounds for termination under section 161.001(b)(1) of the family code and that the evidence is factually insufficient to prove that the termination is in the children's best interests pursuant to section 161.001(b)(2). *See* Act of Mar. 30,

---

[1]*See* Tex. R. App. P. 47.4.

[2]Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use pseudonyms for the minor children that are the subject of this suit. *See* Tex. R. App. P. 9.8(b)(2).

2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001(b)(1)(D)–(E), (2), 2015 Tex. Sess. Law Serv. 18–20 (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001) (hereinafter cited as Tex. Fam. Code Ann. § 161.001(b)); Tex. Fam. Code Ann § 161.206(a) (West 2014). We will affirm.

## I. BACKGROUND

On January 31, 2014, CPS investigator Sarah Jones was asked to investigate a referral involving the alleged neglectful supervision, physical neglect, and medical neglect of Regina and Anna. From the referral, Jones learned that Mother was incarcerated and that her two children—ages one and two—had been staying with an unrelated community member. Although Mother had initially left the girls with their paternal grandmother, the children ended up going to two additional homes, eventually ending up in the home of a stranger.

Jones concluded that this case amounted to "[r]eason to believe for neglectful supervision," naming Mother, the grandmother, and Mother's two adult daughters, Charlie and Marissa, as perpetrators. She based her finding on the fact that "[a]ll three of the individuals [were] adult in nature, and they all left the children with inappropriate caregivers." She explained that the grandmother had left the children with Marissa and Charlie, "who were inappropriate caregiver[s] to the child[ren], [and] unable to provide for their needs." They, in turn, attempted to leave the children with an acquaintance, who refused to take them. Upon the recommendation of this acquaintance, Marissa and Charlie proceeded to leave the children with the woman's neighbor, whom they did not know. This woman

2

was also a stranger to Mother; however, Mother still agreed to sign and have notarized a letter designating this woman as Anna and Regina's primary caregiver while she remained in jail.

Following Jones's investigation, the children were placed in a foster home on January 31, 2014. The foster mother claimed that when the girls arrived at her house, they were suffering from a variety of physical, behavioral, and developmental issues. Regina had rotting teeth, rashes all over her body, and was unable to "say much at all." She refused to eat solid food for the first week and instead continued requesting a bottle of milk. Regina also had problems sleeping, did not like the grooming part of bathing, and would not socialize with other children. Likewise, Anna had never been taken to a doctor for her special needs, and she too suffered from bottle-rot teeth and untreated eczema.

Subsequently, a CPS caseworker met with Mother and explained to her that she would have one year to complete a family plan if she wanted to reach permanency and reunify with her children. The plan included mandatory biweekly visits with Regina and Anna, random drug tests, proof of a safe and stable home, and stable employment. Mother was also required to complete individual counseling, drug classes, and parenting classes.

In November of 2014, Mother tested positive for methamphetamines. CPS was aware of Mother's history of methamphetamine abuse and referred her to drug education classes. Mother again tested positive for amphetamines and methamphetamines in December 2014 and admitted to using hydrocodone and

methamphetamines in March 2015. She admitted to using drugs during December, January, February, and March.

In February 2015, CPS changed the permanency plan and requested a termination of Mother's parental rights based on the best interests of the children.[3] Following a bench trial, the trial court terminated Mother's parental rights pursuant to sections 161.001(b)(1)(D) and 161.001(b)(1)(E) of the family code. Additionally, the trial court determined that termination was in the best interests of the children as required under 16.001(b)(2).

## II. STANDARD OF REVIEW

We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *In re E.R.*, 385 S.W.3d 552, 554–55 (Tex. 2012); *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985).

Termination decisions must be supported by clear and convincing evidence. Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b), 2015 Tex. Sess. Law Serv. 18–20 (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001) (hereinafter cited as Tex. Fam. Code Ann. § 161.001(b)); Tex. Fam. Code Ann. § 161.206(a) (West 2014);

---

[3]At the outset of the case, Regina and Anna's father submitted an affidavit of voluntary relinquishment of parental rights pursuant to section 161.103 of the family code. *See* Tex. Fam. Code Ann. § 161.103 (West 2014). The court terminated his parental rights based on his affidavit and found that termination was in the best interests of the children.

4

*E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to

5

termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated any part of 161.001(1) or that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).

## III. ENDANGERMENT

Mother argues in her first issue that the evidence is legally and factually insufficient to prove endangerment to her children's physical or emotional well-being under sections 161.001(b)(1)(D) and (E) of the family code.

Subsections (D) and (E) provide that the court may order termination of parental rights if it finds by clear and convincing evidence that a parent has:

(D)  knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E)  engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E).

The difference between subsections (D) and (E) is the source of the physical or emotional endangerment to the child.  *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 435 (Tex. App.—El Paso 2004, no pet.); *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).  Under subsection (D), the environment must be the cause of endangerment.  *In re M.J.R.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).  Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under this subsection.  *A.S. v. Tex. Dep't of Family & Protective*

7

*Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment was a direct result of the parent's conduct, including acts, omissions, and failures to act. *A.S.*, 394 S.W.3d at 712; *Perez*, 148 S.W.3d at 435; *Doyle*, 16 S.W.3d at 395.

"Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Boyd*, 727 S.W.2d at 533; *A.S.*, 394 S.W.3d at 711. Accordingly, endangerment constitutes more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment; however, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *M.C.*, 917 S.W.2d at 269 (quoting *Boyd*, 727 S.W.2d at 533); *A.S.*, 394 S.W.3d at 712.

Endangerment of the child's physical or emotional well-being is an element of both subsections. *In re M.Y.G.*, 423 S.W.3d 504, 510 (Tex. App.—Amarillo 2014, no pet.). Because the evidence concerning these two statutory grounds for termination is interrelated, we conduct a consolidated review. *J.T.G.*, 121 S.W.3d at 126 (citing *In re S.D.*, 980 S.W.2d 758, 762 (Tex. App.—San Antonio 1998, pet. denied)).

Mother argues that the children's lack of physical injury demonstrates an absence of endangering conduct. She directs us to the record where the CPS investigator told the court, "I did not find any physical concern." However, it is

8

well settled that "the child does not need to suffer actual physical injury to constitute endangerment." *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.); *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied). The condition of both girls upon arrival at the foster home supports a finding of endangerment. Both girls suffered from untreated eczema, and one suffered from bottle rot. Additionally, Regina was not communicating, refused to eat solid food for the first week, and disliked socializing with other children. Similarly, Anna had been previously diagnosed with Fetal Alcohol Syndrome, but had not received any treatment for her condition. Although there was no evidence the children were victims of physical abuse, the physical and developmental condition of both girls is evidence of Mother's neglect and thus demonstrates that Mother engaged in conduct that endangered both Regina's and Anna's physical or emotional well-being. *In re E.P.C.*, 381 S.W.3d 670, 684 (Tex. App.—Fort Worth 2012, no pet.) (considering child's muscle weakness, lack of coordination, delayed milestones, and delayed development as evidence of endangerment); *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (holding that the children's rotten teeth and developmental delays were a product of avoidable neglect caused by the parents knowingly engaging in conduct that endangered the children's emotional or physical well-being); *See In re P.E.W.*, 105 S.W.3d 771, 778 (Tex. App.—Amarillo 2003, no pet.) (considering the dirtiness of the children and their severe, untreated diaper rash

9

as evidence of conduct endangering the children's emotional and physical well-being).

Mother further argues that she did not knowingly place or knowingly allow the placement of her children in an unsuitable environment by leaving her children with their grandmother. She asserts that the grandmother was the one who chose to place Regina and Anna with Marissa and Charlie and that it is therefore the grandmother's fault the children ended up in the home of a stranger. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's . . . conduct *creates a potential for danger which the parent is aware of but disregards.*" *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (emphasis added)*; see Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Mother knew the grandmother lived out of state and would eventually need to return home. Although Mother claims she did not know she would remain incarcerated for as long as she was, the fact that she did not attempt to find long-term care, especially when she realized she would remain in jail longer, is evidence of avoidable neglect.

Moreover, even if Mother was not directly responsible for her children ending up in the care of a stranger, she allowed it to continue. Mother did not know and had never met the woman caring for her children; however, she felt comfortable signing a document making this woman their temporary caregiver.

There is always a potential for danger when it comes to strangers. *See In re P.M.*, No. 02-14-00205-CV, 2014 WL 8097064, at *23 (Tex. App.—Fort Worth Mar. 19 2015, no pet.) (mem. op. on reh'g) ("[A] factfinder could reasonably form a firm belief or conviction with regard to endangerment under both subsections (D) and (E) from . . . the potential physical danger involved in sending a child out overnight with strangers."). Mother did not know what type of environment she was subjecting Regina and Anna to when she signed the letter. Nevertheless, she allowed this woman to take care of her daughters. *See id.*; *In re J.A.S.*, No. 07-12-00150-CV, 2012 WL 4372952, at *6 (Tex. App.—Amarillo Sept. 25, 2012, no pet.) (mem. op.) (considering evidence that mother subjected her children to the care of strangers as proof of conduct that endangered a child's well-being). Mother's knowingly placing her children with a complete stranger endangered the well-being of her children and therefore supports termination under subsections (D) and (E). *See S.M.L.*, 171 S.W.3d at 477; *In re C.L.C.,* 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.); *In re U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Mother also argues that the evidence was insufficient to find termination based on her history of drug use. She directs us to the CPS investigator's testimony in the record that she did not have any evidence that Mother used methamphetamines while with the children. The endangering conduct does not have to occur in the presence of the child. *See Walker v. Tex. Dep't of Family & Protective Servs.,* 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009,

11

pet. denied). Drug use and its effect on a parent's life and her ability to parent may establish an endangering course of conduct. *In re C.A.J.*, 459 S.W.3d 175, 182 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.)). The record demonstrates that Mother had been dealing with a methamphetamine addiction and continued to struggle with it during the pendency of the case. Following her release from jail, she failed multiple drug tests and told her CPS caseworker that she had used methamphetamines in December of 2014 and January, February, and March of 2015. While there may be no proof that Mother used drugs in the presence of her children, evidence of her continued drug use supports an inference of continued parental misconduct that is likely to subject the children to lives of uncertainty and instability. *See A.S.*, 394 S.W.3d at 712 ("Endangerment of a child's well-being may be inferred from parental misconduct, including conduct that subjects the child to a life of uncertainty and instability."); *M.R.J.M.*, 280 S.W.3d at 502 ("The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent.").

Likewise, the fact that Mother continued using drugs knowing that her parental rights were in jeopardy supports termination under (D) and (E). *See In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding

12

that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *In re S.T.*, 263 S.W.3d 394, 402 (Tex. App.—Waco 2008, pet. denied) ("The evidence that [Appellant] engaged in [criminal] conduct after S.T.'s removal . . . is an additional factor supporting the decision to terminate because it constitutes evidence that [Appellant] continued to engage in conduct even though his parental rights were in jeopardy."); *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("We conclude that appellant's illegal drug activity, a violation of community supervision after agreeing not to commit such acts in the Plan for reunification with her children, established clear and convincing proof of . . . conduct that endangered the well-being of her children."). Mother knew she would be subjected to random drug tests and that the terms of reunification included abstaining from illegal drug use. However, she continued to use methamphetamines, fully aware that doing so could result in additional jail time and prevent her from reuniting with her children. *See In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well[-]being of the child."). Accordingly, Mother's continued drug use supports termination under subsections (D) and (E).

Finally, Mother argues that the trial court erred by relying on her past convictions as evidence of endangering conduct. While imprisonment alone is

not a basis to terminate parental rights, it is certainly a factor to be considered by the trial court. *Boyd*, 727 S.W.2d at 533–34; *M.R.J.M.*, 280 S.W.3d at 503 (citing *S.M.L.*, 171 S.W.3d at 478–79). When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents repeatedly engage in criminal conduct that subjects them to the possibility of jail time, such acts can have a negative impact on a child's physical and emotional well-being. *S.M.L.*, 171 S.W.3d at 479.

Here, Mother's imprisonment was a result of her voluntary, deliberate, and conscious course of conduct that endangered Anna's and Regina's emotional or physical well-being. *See Walker*, 312 S.W.3d at 617 ("If the imprisonment of the parent displays a voluntary, deliberate, and conscious course of conduct, it qualifies as conduct that endangers the child."). Mother's criminal record is expansive. The frequency of her arrests demonstrates that she was engaging in criminal behavior with the understanding that doing so could result in jail time. *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that mother's decision to engage in criminal activity that resulted in her incarceration was clear and convincing proof of conduct that endangered her child's well-being when coupled with her two prior convictions and positive drug test). This is further evidenced by the fact that Mother was arrested before the outset of this case for operating a vehicle while knowing she was not permitted to do so. *See S.M.L.*, 171 S.W.3d at 479 ("[Appellant] committed the crime knowing that, as before, it would result in his incarceration, thus leaving his young

14

daughter without his support . . . ."). Mother knew she was in violation of her probation and that being pulled over would likely result in her arrest; however, this did not stop her from acting.

Likewise, Mother's prior convictions indicate conduct that has the effect of endangering the physical or emotional well-being of her children. *See Walker*, 312 S.W.3d at 617. Conduct endangering a child's well-being may occur before the child's birth and both before and after the child has been removed by the Department. *Id.* Not only did Mother engage in criminal activity prior to CPS's intervention, she continued to illegally use drugs while the Department sought termination of her parental rights. *See J.D.S. v. Tex. Dep't of Family Protective Servs.*, 458 S.W.3d 33, 43 (Tex. App.—El Paso 2014, no pet.) ("[Mother's] repeated criminal conduct threatens the child's sense of stability and security."). Similarly, a parent's abuse of other children in the home can support a finding of endangerment, even if that abuse occurred prior to another child's birth. *In re E.A.G.*, 373 S.W.3d 129, 143 (Tex. App.—San Antonio 2012, pet. denied). Prior to Regina's or Anna's births, Mother had been found guilty of reckless bodily injury to a child after she broke Charlie's finger.

Mother argues that her past criminal conduct is not evidence of past endangering conduct because the crimes were not crimes of moral turpitude. However, the law contains no requirement that a parent's past criminal conduct needs to meet a certain level of severity in order to effectively weigh in favor of termination. Instead, it is necessary to look at the totality of the circumstances

15

surrounding the parent's criminal history, both before and after her parental rights were threatened, in order to determine how to weigh these facts alongside other evidence of parental conduct. *See Walker*, 312 S.W.3d at 618 ("The evidence presented with respect to [Appellant's] pattern of crime, imprisonment, drug use, and violence against family members demonstrates a deliberate course of conduct . . . [that] endangered [the child's] emotional and physical well-being."); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) ("The evidence showed that [Appellant's] continued criminality had contributed to the dangerous environment in which [the child] had lived."); *S.M.L.*, 171 S.W.3d at 479 ("In addition to appellant's violent, criminal behavior and incarceration, appellant's lack of demonstrated concern for his daughter's well-being is further evidence of endangerment.").

Viewing the evidence under the appropriate standards of review, we hold that a factfinder could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Regina and Anna to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct and knowingly placed Regina and Anna with persons who engaged in conduct which endangered their physical or emotional well-being. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's findings under sections 161.001(b)(1)(D) and 161.001(b)(1)(E). We overrule Mother's first issue.

16

## IV. BEST INTERESTS OF THE CHILDREN

In her second issue, Mother argues that the evidence is insufficient to prove that termination would be in the best interests of the children under section 161.001(b)(2) of the family code. *See* Tex. Fam. Code Ann. § 161.001(b)(2). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the best interest of the child;

    (F)    the plans for the child by these individuals or by the agency seeking custody;

    (G)    the stability of the home or proposed placement;

    (H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

17

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases, and other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. The same evidence of acts or omissions used to establish grounds for termination under section 161.001(b)(1) may be probative in determining the best interest of the child. *Id.* at 28.

The evidence detailed above regarding Mother's continuous criminal history, drug abuse, and lack of concern for her daughters' physical and developmental conditions is probative to the best interest inquiry. *See id.*

Moreover, failure to comply with a family service plan and an inability to provide a stable home further support a finding that termination is in the best interest of the child. *M.R.*, 243 S.W.3d at 821. After her release from jail, Mother was unable to secure long-term housing and moved approximately five times between September 2014 and April 2015. Likewise, Mother obtained a job shortly after her release in September, but she lost it only a few months later. Then in March, she informed CPS that she had obtained new employment; however, she failed to ever provide any proof. She also failed to complete her service plan when she failed to attend all but five of her individual counseling appointments, all of her required biweekly visits with her children in January, and

18

at least one of such visits in each of February, March, and April 2015. Even though she was given a three-month extension on the plan, she ultimately failed to complete it.

Evidence of placement and adoption plans is also relevant to best interest. *C.H.*, 89 S.W.3d at 28. A bond has formed between both girls and their foster mother. Also, their foster mother said she would adopt the children if given the opportunity. This evidence supports the trial court's finding that termination was in the best interests of the children. Furthermore, after being with their foster mother for a little over a year, the physical and developmental conditions of both girls have drastically improved.

Viewing the evidence under the appropriate standards of review, we hold that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights to Regina and Anna was in their best interests. We overrule Mother's second issue.

## V. CONCLUSION

Having overruled both of Mother's issues, we affirm the trial court's order terminating the parent-child relationship between Mother and the children.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: MEIER, GABRIEL, and SUDDERTH, JJ.

DELIVERED: October 1, 2015

19