**Opinion issued September 27, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00319-CV

————————————

## IN THE INTEREST OF J.I.L. AND A.V.L., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-01445J**

---

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between N.P. ("Mother") and her eight-year-old daughter ("Daughter") and nine-year-old son ("Son"). In one issue, Mother contends that the evidence was not legally and factually sufficient to support the trial court's

determination that termination of her parental rights was in the children's best interest.

We affirm.

## Background

In September 2016, the Department of Family and Protective Services ("the Department") received a referral, alleging "neglectful supervision" of Daughter and Son by Mother. The report alleged that Mother had left the children unsupervised outside after school for about seven hours without food or water. The report stated that this had happened numerous other times.

The report also alleged that Mother regularly used marijuana and possibly other drugs. The reporter claimed that Mother acted "crazy" because of her drug use and "stabs . . . the walls." The reporter also claimed that Mother had gotten into a physical altercation with her neighbors "when she is under the influence of drugs."

Over the next several months, the Department investigated the report. The investigation revealed that Mother was arrested for illegal drug possession in December 2016. In January 2017, Mother submitted to drug testing and tested positive for methamphetamine and marijuana. Mother informed the Department that the children's father ("Father") was incarcerated in another state.

In March 2017, Mother signed an Agreement for Participation in a Pre-trial Intervention Program with the Harris County District Attorney's Office related to her December 2016 arrest for possession of methamphetamines. In the agreement Mother acknowledged that she had been "charged with the felony offense of possession of a controlled substance." She agreed to "participate in the intervention program for one year beginning today and that I will be supervised during this period by the Harris County Community Supervision and Corrections Department." She also agreed to "follow the recommendations set forth in the copy of the assessment." She further agreed to "participate faithfully in any and all programs recommended by the [Corrections] Department and I will comply with all [Corrections] Department rules and regulations." She indicated that she understood that if she was "terminated from the . . . program for non-compliance, my case will be presented to a grand jury for indictment." Mother agreed that "during the period of intervention," she would "not use, consume, or possess any controlled substances."

Also, in March 2017, the Department filed suit, seeking emergency orders to obtain possession of the children and requesting appointment as their temporary managing conservator. The trial court granted the emergency orders and the temporary managing conservator appointment. In its petition, the Department also requested that the trial court terminate Mother's and Father's parental rights and

sought sole managing conservatorship of the children if family reunification could not be achieved.

In April 2017, with respect to this case, the Department developed a family service plan for Mother. The service plan indicated that the Department had the following "initial concerns": (1) "[Mother] has a history of drug abuse and unable to provide for the children while under the influence of drugs"; (2) "[Mother] is unable to provide the children with adequate care and nurturance due to her drug use"; (3) "[Mother] is unable to provide the children with a stable, drug free home environment"; and (4) "[Mother] is still using drugs and unable to provide the children with a stable, drug free home environment."

The service plan set out a number tasks and services for Mother to complete before reunification with her children could occur. Mother was required to (1) "participate fully in a drug and alcohol assessment" and "follow [the assessment's] recommendations including inpatient and or outpatient drug treatment, individual, group and or family therapy, and or random urine analysis"; (2) "attend all court hearings, permanency conference meetings and family visits"; (3) "submit to random urinalysis/hair follicle drug testing and . . . test negative at all times"; (4) participate in a psych-social assessment and follow all recommendations made by the provider; and (5) complete parenting classes.

In its May 2017 status-hearing order, the trial court approved the family service plan and made it an order of the court. The court found that the goal of the service plan was "to return the children to the parent" and that the plan "adequately ensure[s] that reasonable efforts are being made to enable the parent to provide a safe environment for the children." The trial also found that the plan was "reasonably tailored to address any specific issues identified by the Department." The court determined that Mother had reviewed the service plan and understood it. The court also found that Mother had been advised that

> unless she is willing and able to provide the children with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or the children may not be returned to her.

In June 2017, Mother completed a substance-abuse assessment. During the assessment, Mother admitted to using marijuana, cocaine, and methamphetamine. She also stated that she had recently been diagnosed with anxiety and depression. Based on the assessment, it was recommended that Mother participate in individual and group substance-abuse counseling. Mother was referred to Santa Maria Hostel Intensive Outpatient Program ("Santa Maria") for the counseling.

In addition to her initial positive drug test in January 2017, Mother again tested positive for methamphetamine, cocaine, and marijuana in March 2017. Two months later, in May 2017, she tested positive for methamphetamine and cocaine.

In August 2017, Mother tested positive for methamphetamine, cocaine, and marijuana. In October 2017, Mother was discharged from the substance-abuse program at Santa Maria without successfully completing it because she had failed to consistently attend her therapy sessions, and she had failed to maintain sobriety. After her discharge from the program, Mother tested positive for cocaine, marijuana, and Tramadol in December 2017. Mother also missed several scheduled drug tests.

In January 2018, the district attorney's office filed a motion to revoke Mother's bond in the criminal action for possession of methamphetamines. The State pointed out that Mother had been "placed in the PCS Pretrial Intervention Program" in March 2017. However, the State claimed that Mother was in violation of the agreement that she had signed to remain in the program. The State alleged that Mother had been discharged from the Santa Maria outpatient program without successfully completing it "due to lack of attendance and multiple positive urinalyses." The State averred that Mother "tested positive for cocaine, marijuana, methamphetamine on March 27, marijuana and methamphetamine on April 26, 2017, cocaine on June 9 and July 12, 2017, and failed to submit to a sample on August 16, 2017." It further alleged that Mother had "failed to report for supervision on September 29 and October 23, 2017" and her "whereabouts are currently unknown." The State asserted that Mother "is now considered to be an

6

absconder and is being terminated from the PCS/PTI program at this time due to non-compliance."

In February 2018, Mother requested a continuance of trial, which was set for March 2018. Mother argued that trial should be continued because she was starting a new drug-treatment program. She stated that she needed additional time to complete her services. The trial court denied the motion.

A bench trial commenced on March 8, 2018 with the Department seeking to terminate the parent-child relationship between Mother and Son and Daughter and between Father and the two children.[1] At trial, the Department first offered the testimony of T. Ratcliff, the children's caseworker. On direct examination, Ratcliff confirmed that the children came to the Department's attention when it was reported that Mother left the children "outside by themselves for a long period of time and they had no food and water." She said it was also alleged that Mother "would stab holes in the wall and just behave violently." Ratcliff also confirmed that, during the Department's initial investigation, Mother tested positive for methamphetamine and marijuana.

Ratcliff testified that Mother was arrested for possession of a controlled substance in December 2016. Ratcliff stated that Mother had received pretrial

---

[1] Father does not appeal the trial court's judgment. For this reason, we focus on the facts and evidence as it relates to Mother.

7

intervention for the offense, but Mother had not honored the terms of the pretrial intervention agreement, resulting in an open warrant for her arrest.

Ratcliff also testified that Mother had failed to complete her outpatient substance-abuse counseling at Santa Maria and had been discharged from the program due to lack of attendance. Ratcliff testified that she had gotten special permission for Mother to reenroll at Santa Maria. The admissions representative from Santa Maria told Ratcliff that she had called Mother and left a voice mail regarding reenrollment. Ratcliff reminded Mother to follow-up with Santa Maria, however, Santa Maria later told Ratcliff that they had never heard from Mother regarding reenrolling in the program. Ratcliff also testified that she had referred Mother to the Bess Group but later learned that Mother had missed two of three scheduled sessions.

In addition, Ratcliff testified that, at first, Mother attended the scheduled visitation with her children. But in September and October 2017, Mother did not attend visitations. Ratcliff stated that, after a hearing in December, Mother once again resumed visiting the children.

Ratcliff further testified that she did not know where Mother is living. Ratcliff had been to Mother's home early in the case but had learned that the home flooded during Hurricane Harvey, and Mother no longer lived there. She said that Mother had not given her a new address. Ratcliff also testified that Mother had

told her that she was working, but Mother had never provided Ratcliff with proof of employment.

Ratcliff averred that Mother had not been consistent in keeping in contact with her. She stated that Mother's failure to stay in contact with her was a result of Mother's drug use. Ratcliff testified that Mother had admitted to her that she was using illegal drugs and "needed help."

Ratcliff stated that she considered Mother's drug use to be conduct that endangered the children. Mother had tested positive for cocaine, methamphetamine, and marijuana throughout the pendency of the case. Mother last tested positive for cocaine in December 2017.

Ratcliff also testified that the children had been exposed to domestic violence in Mother's home. Ratcliff testified that, in a forensic interview, Daughter had reported that she and Son "were in the bedroom and [Mother] and [Mother's live-in] boyfriend [were] arguing in another room and then they saw a knife come through the door. So there were knives that were thrown and it ended up through the door."

Ratcliff stated that the children were currently in a residential facility. She said that the children are "doing fine" and that both children attend therapy twice a month. Ratcliff stated that the Department had hoped to place the children with family members, but none of the suggested family members had qualified, after

undergoing home studies, to care for the children. She said that the Department had "done a legal risk broadcast" for the children and three families had been selected for placement of the children. The families were scheduled to be interviewed the next week.

Ratcliff further testified that Daughter's therapist recommended Daughter have "trauma therapy" because she was "not doing as well as she was." The therapist believed that Daughter's worsened behavior was "partly due to some of [Mother's] missed visits." Ratcliff acknowledged that Daughter loved Mother and would "act out" when visits were canceled due to Mother's failure to attend. Ratcliff confirmed that additional therapy would be made available to the children.

Ratcliff stated that she believed terminating the parents' parental rights and naming the Department as permanent managing conservator were in the children's best interest. She said that she "believe[d] that the children have a right to be safe and they have a right to permanency. . . . I don't believe that they would have that with [Mother], so I believe that that would be in their best interest." She agreed that the children "have a better chance of a stable permanent home" if the parents' rights are terminated.

On cross-examination, Ratcliff stated that she believes Mother loves the children and acknowledged that, when Mother did visit them, the visits went well. Ratcliff also acknowledged that Mother recently told her that she had enrolled in

the Bess Group for counseling and that Mother said that she would pay for the counseling herself.

The Department also called L. Buckenham, a representative of Child Advocates. Buckenham testified that Child Advocates did not "believe that Mom can offer a safe and stable environment." She stated, "[W]e think it would be in the best interest of [the children] if the parental rights were terminated." She indicated that the children had improved in school since they were removed from Mother and that they would benefit from additional therapy.

Mother also testified at trial. She explained to the trial court that she had asked for more time to complete her services because she had recently learned that she suffered from "a severe case of depression." She said that she was under the care of a doctor and was taking "depression medication." Mother said that she had also learned that she had been self-medicating her depression with illegal drugs.

Mother testified that she was receiving substance-abuse therapy from the Bess Group and that she was paying for the therapy herself. She claimed that the counseling she had received through Santa Maria had not been helpful. Mother said that, at the time of trial, she was sober and had stopped using drugs. She claimed that she was "a hundred times better" than she had been at the beginning of the case. Mother also testified that she realized that she could not parent her children while abusing drugs. She stated that was the reason "why I'm paying for

11

the substance abuse classes now because I want to put myself in somewhere that I know is actually gonna help me."

Mother disputed that there was a warrant out for her arrest. She acknowledged that she had been charged with possession and had been placed in the pretrial intervention program. She pointed out that she was 37 years old and had "never been in trouble before." She said "This is a bump in my life and it's a bad bump because they're taking my children."

Regarding her children's witnessing domestic abuse, Mother denied that she had an altercation with her boyfriend during which a knife went through the door. She did, however, acknowledge that the children had witnessed one of her past boyfriends grab her and hold her against the wall, and they had also heard arguments she had with her boyfriend.

Mother also testified that she had missed visits with her children because the home she had been renting for six years flooded during Hurricane Harvey. She testified that "the reason for my missed visits and all that was because of the condition of my home." She said that she worked with her landlord to fix the home so that she could live there again. She testified that the home was repaired, she is living there again, and it is ready for her children to come home. However, she also stated that she plans to move to a better school district for her children.

The Department also offered documentary evidence at trial. The evidence included the affidavit supporting initial removal of the children, Mother's family service plan, Mother's drug test results, Mother's records from the Santa Maria outpatient program, filings from the criminal case against Mother for possession of methamphetamine, and a Permanency Plan and Permanency Progress Report from February 2018.

At the end of trial, the court granted the Department's request for termination of the parent-child relationship between Mother and her two children. On April 3, 2018, the trial court signed a judgment terminating Mother's parental rights, finding that termination was in the children's best interest and that Mother had engaged in the predicate acts listed in Family Code subsections 161.001(b)(1)(D), (E), and (O). Specifically, the trial court found that clear and convincing evidence showed that (1) Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger their physical or emotional well-being (Subsection (D)); (2) Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered her physical or emotional well-being (Subsection (E)), and (3) Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.

(Subsection (O)). The trial court also appointed the Department as the children's sole managing conservator.

Mother now appeals the trial court's judgment.

## Sufficiency of Best-Interest Finding

Mother presents one issue in which she contends that the evidence was legally and factually insufficient to support the trial court's best-interest finding. She does not challenge the trial court's findings that she had engaged in the statutory predicate acts found in Family Code Subsections 161.001(b)(1)(D), (E) and (O).

## A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.001(b) (West 2014). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Family Code section 161.001(b) provides that "the [trial] court may order termination of the parent-child relationship if the court finds by clear and convincing evidence" that (1) one or more of the acts enumerated in section 161.001(b)(1) was committed and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2). Although termination may not be based solely on the best interest of the child as determined by the trier of fact, *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, and termination is found to be in the best interest of the child, we will affirm on any one predicate ground because only one is necessary for termination of parental rights. *In re G.A.A.*, No. 01–12–01052–CV, 2013 WL 1790230, at *7 (Tex. App.—Houston [1st Dist.] Apr. 25, 2013, no pet.) (mem. op.). Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier

15

of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id*. The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient for the fact finder to reasonably form a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not

have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

**B.      Best Interest of the Children**

1.      *Applicable Legal Principles*

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In *Holley v. Adams*, the Supreme Court of Texas identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The evidence supporting the predicate grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *See H.D.*, 2013 WL 1928799, at *13.

### 2. *Analysis*

Here, Mother's history of past illegal drug abuse, continuing drug use while this case was pending, and her inability to demonstrate that she can provide a safe and stable home for her children supports the trial court's best-interest determination. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parent's history of drug use is relevant to trial court's best-interest finding); *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.–Dallas 2007, no pet.) (recognizing that factfinder can give "great weight" to the "significant factor" of drug-related conduct). As discussed, the evidence showed that the initial referral to the Department indicated that Mother was neglecting her children, used drugs, and had a history of acting erratically. During its investigation of the report, the Department learned that Mother had recently been

arrested for possession of methamphetamine. Mother then tested positive for methamphetamine and marijuana in January 2017, prompting the Department to seek temporary conservatorship of the children.

The initial substance-abuse assessment of Mother, contained in Santa Maria's records, states that 37-year-old Mother reported as follows with respect to her past drug use:

> [Mother's] drug of choice is marijuana, in which [sic] client reported that she would smoke all day every day about 5 to 10 joints. [Mother] reported that she was 30 years of age when she first tried marijuana. [Mother] reported that her drug use increased since she first started smoking. [Mother] reported that she started snorting cocaine around 32 or 33 years of age. [Mother] reported that she would snort cocaine 1 to 2 times a month but she did not use cocaine too long. [Mother] reported she started smoking meth in 2016 and she really likes meth. [Mother] reported that she would smoke meth daily 1-2 times a day. [Mother] reported that she would spend about $150 to $200 per week on meth.

Mother continued to use cocaine, methamphetamine, and marijuana throughout the pendency of the case even in the face of a court order conditioning her reunification with her children on her ability to remain drug-free. The evidence showed that, after her positive drug test in January 2017, Mother again tested positive for methamphetamine, cocaine, and marijuana in March 2017. Two months later, in May 2017, she tested positive for methamphetamine and cocaine. In August 2017, Mother tested positive for methamphetamine, cocaine, and marijuana. In December 2017, Mother tested positive for cocaine, marijuana, and

Tramadol. And the record indicates that Mother also missed several scheduled drug tests.

A factfinder need not ignore a history of drug dependence and destructive behavior when the evidence establishes that past substance abuse was more than just "remote and isolated incidents." *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied). Evidence of Mother's past pattern of drug use is relevant not only to the stability of the home she can provide, but it is relevant to the emotional and physical needs of her children now and in the future and to the emotional and physical danger in which the children could be placed now and in the future. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, and seven); *see also In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (finding pattern of illegal drug use suggested mother was not willing and able to provide child with safe environment—a primary consideration in determining child's best interest).

Mother points out that "[s]he was quite candid [with the trial court] about her drug use and mental health issues," and "[s]he acknowledged that at the beginning of the case that she did not have 'all [her] stuff together'; suffered from 'severe depression' and was self-medicating with illegal drugs." Mother points to her testimony that she "now takes prescribed medication for her depression; is 'doing much better;' and recently started attending the Bess Group for her

21

substance abuse problem." Mother also pointed to evidence in the Santa Maria outpatient records indicating that, when she did attend group therapy, she "was attentive."

Other than her own testimony, Mother provided no evidence to show that she was under a doctor's care for depression. She also offered no additional evidence to show why she would be successful in completing therapy with the Bess Group when she had failed to successfully complete it at Santa Maria during the pendency of the case. Mother asserts that her failure to complete therapy at Santa Maria was not her fault. She asserts that she was discharged without successfully completing the outpatient program because her home flooded during Hurricane Harvey, causing her to miss her scheduled therapy sessions. *See Holley*, 544 S.W.2d at 371–72 (factors five and nine: the programs available to assist these individuals to promote the best interest of the child and any excuse for the acts or omissions of the parent). However, the records from Santa Maria indicate that, after missing therapy sessions because of the hurricane, Mother "did not attempt to call [her] counselor to inform when she would be returning back to groups." And the evidence showed that the missed sessions were not the only reason Mother did not successfully complete her substance-abuse therapy. Mother was discharged because she failed to maintain sobriety.

Mother also claims that Santa Maria was not an adequate program to help her with her drug use. She asserts that the Bess Group will be a better program for her. However, the evidence showed that, by the time of trial, Mother had missed two of three scheduled visits with the Bess Group. She testified that she missed one visit because she was ill and missed the other by mistake.

When determining best interest, a trial court may measure a parent's future conduct by her past conduct. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). Evidence was presented from which the trial court could have reasonably inferred that Mother's drug abuse would continue in the future. As discussed, the Department presented evidence indicating that Mother had a history of drug use. And, even though she knew her parental rights were in jeopardy, Mother continued to use cocaine, methamphetamine, and marijuana throughout the case and failed to complete the substance-abuse therapy provided to her. In short, the trial court, as fact finder, was free to disbelieve Mother's testimony that she was on a path to sobriety. *See City of Keller*, 168 S.W.3d at 819; *H.R.M.*, 209 S.W.3d at 108.

Mother also asserts that the evidence showed that, despite her drug abuse, her children were being well cared for at the time of their removal. She points to the removal affidavit in which the Department's representative stated that the agency's investigation indicated that the children appeared to be cared for and not

abused or neglected. Mother points out that the affidavit indicates that the investigation did not show that Mother used drugs "in front of the children or cared for them while intoxicated." Nonetheless, a parent's drug use is a condition indicative of instability in the home environment because it exposes a child to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.).

Here, the record demonstrates that Mother's continued drug use has placed her in jeopardy of being incarcerated. In December 2016, Mother was arrested for the offense of possession of methamphetamine and served nine days in jail. In March 2017, the district attorney's office provided Mother with an opportunity to avoid prosecution by allowing her to participate in a pre-trial drug program. As part of the program, Mother agreed to abide by certain terms, including refraining from illegal narcotics use to avoid prosecution.

The evidence showed that Mother failed to abide by the terms of the agreement because she continued to use illegal narcotics and failed to report to the corrections department. As a result, the district attorney's office filed a motion to revoke her bond. In the motion, the district attorney's office stated that it considered Mother to be "an absconder" and was terminating her participation in

24

the pre-trial intervention program "due to non-compliance." Ratcliff testified that there was a warrant out for Mother's arrest. Thus, the evidence showed that Mother continued to use drugs while this case was pending even though she knew that doing so would put her at risk of incarceration.

In addition, the trial court heard evidence that the children were exposed to domestic violence, which is supportive of the trial court's best-interest finding under the third *Holley* factor: the emotional and physical danger to the child now and in the future. *See Holley*, 544 S.W.2d at 371–72; *In re J.I.T.P.*, 99 S.W.3d at 846 (stating domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest). During a forensic interview, Daughter reported that she and Son were in a bedroom when a knife came through the door during an argument between Mother and her live-in boyfriend. Although she generally denied that they had witnessed any domestic abuse, Mother acknowledged that the children had heard arguments between her and her boyfriend, and they had witnessed her boyfriend grab her and hold her against the wall.

The Department presented additional evidence relevant to the best-interest finding under the following factors: the emotional and physical needs of the children now and in the future, the programs available to assist these individuals to

promote the best interest of the child, and the plans for the children by those seeking custody. *See Holley*, 544 S.W.2d at 371–72 (factors two, five, and six).

The evidence showed that the Department had made efforts to place the children with family members identified by Mother. However, the Department determined the suggested family members not to be suitable placements.

Caseworker Ratcliff testified that the children currently reside in a residential facility. She stated that the Department had "done a legal risk broadcast" for the children and three families had been selected for placement of the children. She said that the families were scheduled to be interviewed the next week.

Ratcliff also testified that the children are in therapy twice a month. She said that Daughter's therapist recommended Daughter have "trauma therapy" because she was "not doing as well as she was." The therapist believed that Daughter's worsened behavior was "partly due to some of [Mother's] missed visits." Ratcliff acknowledged that Daughter loved Mother and would "act out" when visits were canceled due to Mother's failure to attend. Mother points out that the permanency report indicates that it was recommended that Son also receive trauma therapy as well. The permanency report also indicates that Son has ADHD for which he is prescribed two medications.

26

Mother points out that Ratcliff agreed that "there's supposed to be some therapy with the children and the mother to help transition saying goodbye to the mother." When asked whether Mother participated in that type of therapy, Ratcliff stated, "There was a therapist, because it was difficult to get the therapist to come out and visit, but we did have one visit where the therapist was present and that was on February 21st."

Mother also highlights that the permanency report shows that the recommendation for trauma therapy was made following an assessment of the children in June 2017. Other recommended services were also made for the children, such as speech therapy for Son and "participation in activities to develop verbal comprehension" for Daughter. Mother states in her brief that "the record does not establish what, if anything, [the Department] did to meet those recommendations beyond Ratcliff's statement that the children were receiving some type of unspecified therapy twice per month." However, when asked, Ratcliff indicated that additional therapy would be made available to the children.

Evidence was also presented relevant to the fourth *Holley* factor, the parental abilities of the individual seeking custody. *See id.* The evidence showed that Mother missed scheduled visits with the children. In this regard, Ratcliff testified that initially Mother "was doing great with her visits up until August." Ratcliff

27

said there were no visits in September and October, and "then when we came to court in December, [Mother] started visits back up after that last hearing."

In her brief, Mother offers the following regarding her missed visits: "[Mother's] home flooded during Harvey and was inhabitable. Consequently, she was unable to visit the children in September and October." She also claimed that standardized testing at the children's school and "problems with [her] transporter's vehicle" also caused her to miss visits. However, Mother does not explain how these reasons caused her to miss visits for the entirety of September and October with Ratcliff testifying that the visits did not resume until sometime in December. Nor does Mother address why she did not maintain contact with Ratcliff.

With respect to her living situation, Mother testified that that the home she had been renting for six years was repaired after it flooded, and she was once again living there. She said that it was ready for the children to come home.

Ratcliff testified that she knew that Mother's residence had flooded during the hurricane, and she said that she had visited Mother's home before it had flooded. However, Ratcliff also testified that Mother had not provided her proof of where she was living at the time of trial. She further testified that Mother had not provided her with employment verification. We note that "[a] parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14–12–00850–CV, 2013 WL 507325, at *9

28

(Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also Holley*, 544 S.W.2d at 371–72 (factor two: identifying emotional and physical needs of child now and in the future as factor in assessing child's best interest).

Mother further points out that no evidence was offered regarding the first *Holley* factor, desires of the children, even though the children, who at eight and nine years old, are old enough to express their desires. *See Holley*, 544 S.W.2d at 371–72. She points out that Ratcliff's testimony indicates that Daughter loves Mother and that Mother loves her children. However, Texas courts have recognized that when considering the best interests of a child, "[s]ometimes, love is not enough." *J.D.S. v. Tex. Dep't of Family Protective Servs.*, 458 S.W.3d 33, 46 (Tex. App.—El Paso 2014, no pet.).

Mother also relies on the evidence indicating that the children need additional therapy because of their separation from her. However, Mother fails to fully recognize the role that her own conduct played in the removal of the children and in their continued separation from her. The evidence shows that the Mother's drug abuse led to children's removal and caused the Department to pursue termination of her parental rights.

In sum, Mother correctly cites some evidence in the record that weighs against the trial court's finding that termination was in the children's best interest. However, evidence cannot be read in isolation; it must be read in the context of the

entire record. *See In re K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at \*16 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). Significantly, a parent's past performance as a parent is relevant to a determination of her present abilities to provide for a child. *See In re C.H.*, 89 S.W.3d at 28. "[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346.

Here, Mother's continuing drug abuse supports an inference of her future inability to provide a safe and stable home for her children. Although evidence of past misconduct, standing alone, may not be sufficient to show present unfitness, a factfinder may gauge a parent's future conduct by her past conduct, supporting a finding that it is in a child's best interest to terminate the parent-child relationship. *See In re A.N.D.*, No. 02–12–00394–CV, 2013 WL 362753, at \*2 (Tex. App.— Fort Worth Jan. 31, 2013, no pet.) (mem. op.); *see also In re B.S.W.*, No. 14–04– 00496–CV, 2004 WL 2964015, at \*9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (declaring that parent's failure to show he or she is stable enough to care for child for any prolonged period entitled trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption").

After viewing all the evidence in the light most favorable to the best-interest findings, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Mother and her children was in their best interest. We also conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's findings that termination of the parent-child relationship between Mother and her children was in their best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Mother and her two children was in the children's best interest.

We overrule Mother's sole issue.

## Conclusion

We affirm judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Massengale.