# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00766-CV

---

**E. D., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 267,106-B, THE HONORABLE CHARLES H. VAN ORDEN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

E.D. appeals from the trial court's final decree terminating her parental rights to her sons "Doug," "Junior," "Carl," and "Gary."[1] The court determined that E.D. had knowingly placed the children with persons who engaged in conduct that endangered their physical and emotional well-being, that she constructively abandoned the children, and that she had not complied with a court order that established actions necessary for her to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(E), (N), (O). The court also found that termination of her parental rights was in the children's best interest. *See id.* § 161.001(b)(2). E.D. complains that the evidence is legally and factually insufficient to support the trial court's findings related to

---

[1] We refer to appellant by her initials and to the children by aliases. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The trial court also terminated the parental rights of the children's fathers, but neither has appealed.

best interest and to statutory grounds for termination under subsections (E), (N), and (O). As explained below, we affirm the trial court's decree.

## PROCEDURAL AND FACTUAL SUMMARY

Doug was born in 2011, Junior in 2012, Carl in 2014, and Gary in 2015. C.B. is Doug's father; M.H. is the father of Junior, Carl, and Gary. The Texas Department of Family and Protective Services' removal affidavit stated that the Department got involved with the family in 2012, when it was informed about "concerns for failure to thrive" for Junior, that domestic violence had occurred between E.D. and M.H. while Junior and Doug were present, that the parents had mental health issues, and that C.B. and M.H. had a fight in which M.H. was stabbed. In late 2014, about ten months before Gary was born, the trial court signed an order placing the three older children with M.H.'s parents, Denice and Robert; designating Denice and Robert as the children's joint managing conservators and the parents as possessory conservators; limiting the parents to supervised visitation; and providing that once Carl turned four, E.D. and M.H. could have visitation under the standard possession order.

Three years later, the Department sought custody of all four children after receiving reports alleging neglectful supervision of the children; that Junior "was in the care of" his father, M.H.; that M.H. had slapped Doug, his stepson; and that Doug had said M.H. bit him on the arm. During an investigation, M.H. told officers that Doug "has anger issues and hits and slaps himself" and that he might have been injured when M.H. "had to restrain" him. However, law enforcement officers observed "finger mark bruises on the left side of [Doug's] cheek," less apparent marks on the right side of his face, and scratch marks and bruising on his neck. A

physical examination found that Doug had injuries "consistent with physical abuse"—"linear bruising on his neck, a black eye, bruised face, and [a] bite mark on his left upper arm."

The affidavit further stated that a Department caseworker interviewed Denice, who admitted that she, Robert, and the children had been living with E.D. and M.H. Denice "admitted to deplorable living conditions," including broken windows and a lack of running water that meant the children had to "urinate and defecate outside on the ground," but she was not concerned because she said she and Robert would be moving soon. However, Denice could neither provide any details about the move, nor explain "how she planned to ensure the children's basic and safety needs" in the meantime, and she seemed more concerned about her son, M.H., than about the children's safety or Doug's injuries. The children were removed and placed in foster care. A final hearing began in April 2019 and concluded in October 2019, at which time the trial court signed the decree of termination. E.D. did not attend the October hearing—her attorney said E.D. had informed her that she was in North Carolina.

Department caseworker Latrice Madison testified at both the April and October hearings and stated that the children were removed due to physical abuse by M.H. Madison testified that although the order placing the older children with Denice and Robert barred E.D. and M.H. from unsupervised visitation, Denice, Robert, E.D., and M.H. all admitted that E.D. and M.H. had been living in the same house and were left unsupervised with the boys.

Madison said that when the children were removed, the younger boys, Carl and Gary, were "fine" and did not exhibit behavioral problems. Doug and Junior, however, expressed homicidal and suicidal thoughts and had significant behavioral problems. At the April hearing, Madison testified that Junior had been placed in a foster home in mid-2018 and that his foster parents wanted to adopt him. Madison testified that when Junior was removed from

3

Denice and Robert's care, he was "pretty over the top where he had physical aggressive behaviors," "described blowing up his day care," and "would probably threaten you or hit you or spit on you and call you names" if angry. Since his removal, Junior was happy and doing well in his foster home and had made significant progress. Madison said, "He had homicidal and suicidal ideations, and now he wants to live. He's always happy. He's made a lot of progress even [at] school. The school, his grades are coming up." She had talked to him about the possibility of adoption, and she testified that Junior "is ready. He calls them mom and dad. He calls it his forever home." Junior was "very adamant that he does not want to live with his parent[s] or probably see them."

Doug was initially placed in the same foster home as Junior but had to be removed shortly before the April hearing, hospitalized for several days, and placed in a residential treatment center (RTC) because he had been physically violent at school and at home, especially against Junior—he had hit and thrown things at his foster mother and had hit Junior with a skateboard and "told him to die." Madison said that when the boys lived together in the foster home, Junior had expressed concerns that Doug's behavior would "ruin[] the ability for [Junior] to stay forever." Doug, like Junior, had expressed homicidal and suicidal thoughts, and Madison testified in April that he had not made as much progress as Junior: "He's not saying he wants to kill anymore, but suicidal ideations are there. He's still very depressed." By the time of the October hearing, however, Doug had made enough progress that he had been moved from the RTC to a therapeutic foster home. Madison testified that when Doug talked about seeing his parents, he "would go back and forth. Sometimes he wouldn't want to see his parents, and sometimes he will want to see his parents."

4

The youngest boys, Carl and Gary, were placed together in another foster home in December 2017, and Madison had no concerns about that placement. She testified in April that when asked about their foster home being made permanent, "They'll say they want to go back with mommy, but at the same time they say they want to stay in the [foster] home."

Madison testified that E.D. had completed some of the requirements of her safety plan. However, she was discharged from counseling because she had too many cancellations, and her visitations were "abated" due to no-shows or last-minute cancellations—E.D. told Madison that she had forgotten at least one visitation. E.D. saw all four children in July 2018. Madison testified that E.D. had a visit with Doug and Junior for Christmas 2018, but that Madison was unable to get approval for a Christmas visit with the two younger children because E.D. had been disruptive during a court hearing, yelling insults at their foster parents. E.D. therefore had not seen Carl and Gary since July 2018. Asked about E.D.'s conduct during the one or two visits Madison had observed, she said that "[f]or the most part, she wasn't able to handle either of the children for any visits." Madison also said she "had to come in and interject because I didn't see parenting."

Madison conceded that E.D. had not been accused of hurting the children and that "all the allegations" were about M.H., who was "beating [Doug and Junior], biting them, whipping them, [and] spanking them." However, Madison said that it was "not correct" to say that E.D. "was not offending or didn't do anything," explaining that E.D. "knew what was going on" but kept living with M.H. and leaving the children in his care. She also noted that the children "talk about the domestic violence at the home." Madison testified that E.D. continued to live with M.H. throughout the case and said she believed E.D. had "basically chosen [M.H.] or somebody else over these children" and had not shown that the children were a priority for her,

5

noting that E.D. had not come to the October hearing despite knowing about it. She believed termination was in the children's best interest because:

> [B]oth parents had a CPS case before where they weren't given—they weren't able to have the kids returned to them. With this case, they had a fighting chance and they made no progress. They weren't able to—in 18 months they weren't able to have therapy and they weren't able to make any progress. They haven't seen the children in months, hadn't really put up a fight to see the children. The children are doing—the three youngest are doing very well where they are. They are thriving. They weren't thriving when they were with the relatives so it's in the best interest of the children for them to remain where they are.

Madison believed that it was in the best interest of the three younger boys for them to be adopted by their current foster placements.

At the October hearing, Christel Holliman, the family's new caseworker since May 2019, testified that E.D. had texted the day before to say she was in North Carolina and would not attend the hearing. E.D. had texted in early September to say "she was homeless and lost her job and wasn't with [M.H.] anymore," but when Holliman replied to try to set a meeting to arrange assistance, E.D. did not respond. As far as Holliman knew, E.D. was still homeless. E.D. had not had any visits or other contact with the children since Holliman's assignment to the case. Holliman said that although the trial court had reinstated E.D.'s visitations after the April hearing, E.D. never attempted to schedule a visit.

Holliman said that Doug had been released from the RTC and placed in a therapeutic foster home. He "still has struggles, but he's doing better," and Holliman believed that he could be adopted in the future. Holliman testified that Carl and Gary were bonded with their foster parents and "very much at home there." She believed that they wanted to stay in their foster home and said that the boys "say they're safe and they're happy" in that home. As

6

for Junior, she said his foster placement was going well—"he calls them mom and dad. And he told me to tell the Judge that he's happy." Holliman said Doug sometimes wants to talk to E.D., but she was not sure maintaining contact with E.D. "would be in his best interest" because he has "a lot of behaviors. He's got a lot of issues. And I don't know if that would be bad for him." She had tried to call E.D. so that Doug could speak to her, but E.D. "doesn't answer the phone."

Pamela, Junior's foster mother, testified that he had been placed in her home since August 2018, that she and her husband hoped to adopt him, and that he was "very happy with us. He calls us mom and dad." Pamela testified that Doug, who was seven at the time, was placed in their home for about three and a half weeks and did "okay" at first, but by the third week, "[h]e was throwing things, yelling, trying to leave, [and] physically assaulted his brother." Pamela was "heartbroken" about having him removed, but "did not have the ability to deal with him" and "felt like I was hurting him more than helping him." She and her husband took Junior to visit Doug at the RTC, and they were planning another visit to Doug's new therapeutic foster home. If his behavior improves sufficiently, Pamela said, she and her husband were open to the possibility of having him return to their home and had "already spoken to the caseworker about it." Pamela said that E.D. had sent a "happy birthday" text to Junior in July 2019 but had not sent him birthday or Christmas gifts "or anything else." Pamela did not believe E.D. "put forth an effort to have the children returned." She thought that it was in Junior's best interest for E.D.'s rights to be terminated and for her and her husband to adopt Junior and give him the permanent home he needs.

Carl and Gary's foster father, Tracy, testified that the boys had been in his home since December 2017 and that he and his partner wanted to adopt them. He said that the boys

considered the foster home to be their home, that they referred to Tracy as their dad, and that, "[w]ithout a doubt," termination and adoption was in the boys' best interest.

## STANDARD OF REVIEW

To terminate a parent's rights to her child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In our review of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible," *J.F.C.*, 96 S.W.3d at 266, but we need not disregard undisputed evidence contrary to the determination, *K.M.L.*, 443 S.W.3d at 113. If after

8

reviewing the evidence, including undisputed evidence that does not support the findings, we conclude that no reasonable factfinder could have formed a firm belief or conviction that the Department carried its evidentiary burden, the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449. In considering factual sufficiency, we review the entire record and ask whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence that could not be credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction as to the truth of the Department's allegations, we will hold that the evidence is factually insufficient. *Id*.

## DISCUSSION

E.D. argues that the evidence is legally and factually insufficient to support the trial court's findings that she committed the three recited statutory grounds for termination. She further asserts that the evidence is legally and factually insufficient to support the finding that termination was in the children's best interest.

*Statutory Grounds*

E.D. argues that the evidence does not support termination of her rights to all four children under subsection (E) because the older three children had been placed by the Department into the care of their grandparents, not E.D. Only Gary, the youngest, was in her care at the time, and E.D. asserts that only the grandparents could have knowingly placed the older children with someone who endangered their well-being. Thus, E.D. argues, it was error to terminate her rights under subsection (E) as to the older three children, who were not in her care.

9

Subsection (E) allows for the termination of a parent's rights to her child if the factfinder determines that she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "'[E]ndanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Thus, the Department was required to show by clear and convincing evidence that E.D., through her own acts and omissions, exposed the children to loss or injury or jeopardized their emotional or physical well-being. *See A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 698 (Tex. App.—Austin 2019, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Endangerment may be inferred from parental misconduct. *A.C.*, 577 S.W.3d at 698. Evidence of domestic violence is also relevant to endangerment, even when the violence is not directed at the children. *J.G. v. Texas Dep't of Family & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

It is true that the older three children had been removed from E.D.'s custody. E.D. therefore insists that she lacked the authority to place the children with M.H. and focuses only on whether M.H. abused Gary and whether E.D. knew of such abuse. However, the older three children had been placed in the conservatorship of their grandparents, and although E.D. and M.H. had been ordered to have only supervised visitation, they lived with the children and the grandparents and the adults all admitted that E.D. and M.H. spent unsupervised time with the children. During one of those times, M.H. abused Doug. Madison testified that E.D. "knew what was going on" and that despite that knowledge, E.D. continued to live with M.H., left the

10

children in his care, and "basically chose[]" him over the children. Madison also noted that the children talked about domestic violence at home, and the evidence established that the older two boys were emotionally disturbed when they were removed. *See N.D. v. Texas Dep't of Family & Protective Servs.*, No. 03-14-00815-CV, 2015 WL 1778347, at *4–5 (Tex. App.—Austin Apr. 16, 2015, no pet.) (mem. op.) (despite Department's concerns about father and protective order against him, mother allowed him to return to home once case was dismissed, allowed child to be around him, and allowed him to continue living with her after additional violence; trial court could have credited evidence of mother's continued contact with father and violence in home, along with mother's illegal drug use and alleged criminal activity, to find she had "engaged in a conscious course of conduct that endangered her children").

It is not necessary for Gary to have been targeted by M.H.'s violence or to have otherwise suffered direct harm. *See E.N.C.*, 384 S.W.3d at 803 ("endangering conduct need not be directed at the child"); *J.G.*, 592 S.W.3d at 524 (same). And although the older boys had been removed from her care, E.D. retained her parental rights to them and knowingly violated the earlier court order by living with them and M.H. Although E.D. did not have the authority to move the older boys to another home, Madison testified that it was "not correct" to say that E.D. was not culpable, explaining that E.D. "knew what was going on" but continued to live with M.H. and left the children in his care. While the children were alone with M.H.—the result of acts or omissions by Denice, Robert, and E.D.—M.H. abused Doug to such a degree that he had a bite mark on his arm, "finger mark bruises" on his face, and scratches and bruises on his neck. In addition, E.D did not complete services intended to help her improve her parenting skills, was apparently homeless at the time of the final hearing, and had not attempted to see her children in the six months between the final hearing dates. *See In re A.J.H.*, 205 S.W.3d 79, 81 (Tex.

11

App.—Fort Worth 2006, no pet.) (conduct that has effect of subjecting child to uncertainty and instability may endanger child's physical and emotional well-being).

E.D. notes that the Texas Supreme Court recently amended rule 277 of the rules of civil procedure to require that in a parental-termination case submitted to a jury, the trial court "shall submit separate questions for each parent and each child" as to each statutory ground alleged. *Order Amending Texas Rule of Civil Procedure 277*, Misc. Docket No. 20-9008 (Tex. Jan. 8, 2020) (amendment effective May 1, 2020). However, that amendment is not effective until May and does not apply to a trial court's ruling in a bench trial. Further, all the children were in the same household under the same circumstances, and thus the evidence is the same, as is our analysis, save for the fact that the two younger boys did not show any ill effects when they were removed and placed into foster care. But that difference does not change our conclusion: a parent's rights to her child may be terminated even if the conduct made the subject of a subsection (E) allegation was directed at another person in the household. *See, e.g., J.D.S. v. Texas Dep't of Family Protective Servs.*, 458 S.W.3d 33, 41 (Tex. App.—El Paso 2014, no pet.) ("To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct.").

We hold that the evidence is both legally and factually sufficient to support the trial court's determination that E.D. had engaged in a conscious course of conduct that endangered the children's emotional and physical well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). We overrule E.D.'s first issue on appeal. Because we have held that sufficient evidence supports the trial court's finding of statutory ground for termination under subsection (E), we need not address her second and third issues, which challenge the evidence supporting the court's findings under subsection (N) and (O). *See A.C.*, 577 S.W.3d at 698.

*Best Interest*

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The children's need for permanence is the paramount consideration when determining their present and future physical and emotional needs. *L.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at *1.

E.D. argues that the trial court's best-interest determination did not take into consideration: "the expressed desire of some of the Children to be with E.D."; Doug's emotional

and physical needs; the Department's "lack of a permanent plan" for Doug, who will remain in a therapeutic foster home for the time being; the "lack of evidence of E.D. doing any acts or omissions that caused all the Children's removal"; the fact that the siblings will be separated; the fact that E.D. completed some of her required services; E.D.'s successful visits with the children; and the fact that the trial court had abated her visits for three months and that the Department then barred her from visitations over a ten-month period. Thus, she argues, the evidence is insufficient to support the trial court's finding that termination was in the children's best interest.

Evidence showed that upon their most recent removal, both Doug, who was six years old, and Junior, who was five, were having homicidal and suicidal thoughts and serious behavioral problems. Doug had to be hospitalized and placed in a residential treatment center for several months. By the time of the hearing in October, he had improved to a point that he could be moved into a therapeutic foster home, and Holliman believed he could be adopted in the future. He was still depressed and expressed suicidal thoughts, but he was no longer expressing homicidal thoughts. As for Junior, his behavior had improved significantly since his removal and placement in his foster home and he was no longer expressing homicidal and suicidal ideations. He was happy and making good progress in school and was "adamant" that he did not want to return to his parents and instead wanted to be adopted by his foster parents. His foster mother testified that she and her husband wished to adopt him and that they were open to having Doug returned to their home if his behavior continued to improve.

Although there was testimony that Doug vacillated about wanting to see his parents, Holliman testified that she was concerned that ongoing contact with E.D. might harm Doug's well-being and noted that E.D. had not answered the phone when Holliman and Doug tried to call her. Further, the reason for the children's removal was that M.H. beat Doug, and

14

Madison testified that E.D. knew about M.H.'s violent behavior and still allowed him to be alone with the children. The children had been removed from E.D.'s and M.H.'s care and placed with their grandparents, but E.D. and M.H. moved in, violating the court's order and living in a house that lacked running water and had other safety issues.

Gary and Carl were thriving in their foster home, and their foster parents hoped to adopt them. There was testimony that they sometimes said they wanted to return to E.D. but also that they wanted to remain in their foster home. Holliman testified that both boys were bonded with their foster fathers and were safe, happy, and "very much at home" with them. *See M.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (in considering best interest of child too young to express wishes, factfinder may consider that child has bonded with foster family, is well cared for, and has spent minimal time with parent).

As for E.D.'s parenting skills, programs available to assist her in parenting, her plans for the children's future, and the stability of her living situation, *see Holley*, 544 S.W.2d at 371-72, E.D. did complete some of the requirements of her safety plan, but her therapy and visitations were terminated or abated due to her cancellations or no-shows. She saw all four children in July 2018 and had seen Doug and Junior at Christmas 2018, but she was not allowed to see the younger children at that time because of her behavior toward their foster parents. Madison testified that when she observed E.D.'s visits, she "didn't see parenting." Although E.D. was given permission to resume visits between the April and October hearings, she did not make any effort to do so and did not answer her phone when Holliman tried to let Doug speak to her. *See M.R.*, 2018 WL 1023899, at *3 (factfinder may consider, among other factors, that child has spent minimal time with parent). E.D. told Holliman about a month before the final hearing

15

in October that she was homeless and without a job, and she did not appear at the hearing, having informed Holliman and her attorney just before the hearing that she was in North Carolina. E.D. did not present any evidence about her view of her parenting abilities, any excuses for her past behavior, her plans for the future, or her relationship with the children.

Although E.D. argues that it was not her conduct that led to the children's removal, there was testimony that the children were present for domestic violence between E.D. and M.H. to such a point that the children talked about the violence. E.D. and M.H. moved in with Denice and Robert, violating the earlier court order, and Madison testified that E.D. left the children in M.H.'s care despite knowing about his violent tendencies. She also continued to live with him while the case was pending, and Madison testified that E.D. had "basically chosen" him over the children and had not shown that the children were important to her. Further, during the time she lived with the children and their grandparents, there is no indication that E.D. took any action to improve the children's living conditions—conditions that included broken windows and a lack of running water.

Madison, Holliman, and the foster parents believed termination was in the children's best interest; there were plans for the three younger children to be adopted by their foster parents; Holliman believed Doug would also eventually be adoptable; and the witnesses believed termination would give the children stability and permanence, the need for which is of primary consideration. *See L.R.*, 2018 WL 3059959, at *1; *D.R.A.*, 374 S.W.3d at 533. Considering this record as a whole, we cannot conclude that the evidence is legally or factually insufficient to support the trial court's best-interest determination. We overrule E.D.'s last issue on appeal.

16

**CONCLUSION**

We have overruled E.D.'s issues on appeal challenging the sufficiency of the evidence supporting the trial court's findings of best interest and the subsection (E) statutory ground for termination. We therefore affirm the trial court's decree of termination.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed: April 17, 2020